558 So.2d 802 (1990)
LANDMARK LAND COMPANY OF LOUISIANA, INC. and Dixie Savings and Loan Association
v.
Edward J. JEMISON and Cabildo Construction Company, Inc.
No. 89-CA-700.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1990.
*803 Jerome K. Lipsich, Sharon Cormack Mize, Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, New Orleans, for plaintiffs/appellants.
Coleman T. Organ, Gretna, for defendant/appellee Edward F. Jemison.
Peter A. Feringa, Jr., Christoffer Friend, New Orleans, for defendant/appellee Cabildo Const. Co., Inc.
Robert C. Evans, Brenda K. Jones, New Orleans, for defendant/appellee Certain Ins. Co. In London, England.
Before CHEHARDY, GRISBAUM and GOTHARD, JJ.
GOTHARD, Judge.
This case involves allegations of building ruin of the Elmwood Oaks Condominiums (formerly Evangeline Trace Condominiums) brought against the contractor, Cabildo Construction Company, Inc. and the architect, Edward Jemison. Defendants filed exceptions of no right of action and res judicata which were maintained by the trial judge. Plaintiffs, Landmark Land Company and Dixie Savings and Loan Association, appeal that decision.
On December 9, 1980 Evangeline Trace Condominiums (Evangeline) entered into a contract with Cabildo Construction Company, Inc. (Cabildo) for the construction of 102 condominiums on land owned by Evangeline. The contract, which specified the improvements be constructed according to plans and specifications previously completed by Edward F. Jemison (Jemison) and paraphed to the construction contract, was funded by Dixie Savings and Loan Association (Dixie).
In 1983 the 102 units were completed and subsequently 22 were sold to individual owners. Evangeline executed a promissory note in the amount of $8,723.00 in favor of Cabildo for the last installment due on the construction contract. In 1984 when Evangeline defaulted, Cabildo filed suit in Jefferson Parish to collect on the note. Evangeline filed a reconventional demand denying the obligation to pay and asserting that Cabildo failed to perform the contract in a workmanlike manner. Specifically, Evangeline alleged the following:
a) failure to use specified roof shingles and the substitution of inferior building materials, resulting in numerous leaks from either the flashing or roofing;
b) failure to provide sufficient caulking throughout the facility, resulting in numerous leaks;
c) failure to use specified lumber and the substitution of inferior grades, resulting in wall and baseboard warping;
d) failure to provide proper drainage, resulting in repeated flooding of condominium unit number 312, and in the area in front of the mail boxes of Building 300;
e) failure to use specified hollow metal doors for the entrance doors, and the substitution of inferior wooden doors;
f) failure to properly paint interior areas in that where sheetrock repair or touch-up paint was needed, Cabildo used a different color paint, resulting in the necessity of repainting the interior areas;
g) numerous leaks throughout the facility, resulting in damaged ceiling tiles which have been replaced repeatedly, as well as damaged sheetrock and wooden structures;
h) failure to properly install fascia board, resulting in warping and splitting;

*804 i) failure to use steel frames on outside doors and substituting inferior wooden materials.
Sales of the condo units slowed and Evangeline was unable to pay its $3,996,796.95 indebtness to Dixie. On February 6, 1985, after the suit on the note and the reconventional demand had been filed but before resolution of the case, Evangeline executed a dation en paiement transferring ownership of the unsold 80 units to Dixie for release of Evangeline's debt. Dixie, through Landmark Land Company of Louisiana (Landmark), sold the remaining 80 units over the following two years.
Subsequent to execution of the dation en paiement on December 30, 1986 Evangeline and Cabildo settled the suit on the promissory note and reconventional demand for $1,500. The individual unit owners and Dixie were never made a party to the suit, nor did they enter into the settlement agreement.
In 1987 the building fell into disrepair. Numerous leaks led to rotting wood which caused balconies to sag and at least one staircase to collapse. The unit owners, through their condominium association, Elmwood Oaks Condominium, Inc.,[1] threatened to sue Dixie for the cost of repairs. On December 4, 1987 the owners and their association settled with Dixie in an agreement which provided that Dixie would fund repair projects in an amount not to exceed $407,422.00. In return the association, representing the owners, released their claims against Dixie and further, assigned any and all rights arising from the faulty construction of the building to Dixie.
On December 30, 1987 Landmark and Dixie filed a petition for damages against Cabildo, Jemison and various insurers alleging that defendants were liable for the falling to ruin of the condominiums due to poor workmanship in planning and construction.[2] An amended and restated petition for damages filed by plaintiffs on May 13, 1988 asserts that the plans did not provide for proper flashing and that Cabildo failed to meet its contractual obligation to install sufficient flashing to render the building watertight.
Defendants, Cabildo and Jemison, filed several exceptions, including no right of action and res judicata. In maintaining those exceptions the trial court found that Evangeline's reconventional demand and Dixie's current demand are the same. The trial court further found that Evangeline reserved its rights against Cabildo and settlement of Evangeline's claim ended all rights against Cabildo. We disagree.
No Right of Action
A dation en paiement is governed by LSA-C.C. arts. 2655 et seq. LSA-C.C. art. 2659 provides:
Except with these differences, the giving in payment is subjected to all the rules which govern the ordinary contract of sale.
The only exceptions to that rule are inapplicable in the instant case.[3] Thus, the dation of the 80 condominium units have the same effect as a sale for purposes of warranties.
*805 It is clear that a seller warrants that the property sold is free from hidden defects and fit for the purpose intended. LSA-C.C. art. 2476. A warranty of fitness can be limited or waived by agreement of the parties LSA-C.C. 2503. Waiver of the implied warranty of fitness must be expressed clearly and unambiguously. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973).
In the reasons for judgment the trial court explained that the warranties specifically transferred to Dixie were those against all preceding owners or vendors. The trial court reasoned that, "Cabildo was neither an `owner' nor a `vendor', consequently, all rights against Cabildo were reserved by Evangeline." This is a misstatement of the law as previously set forth in this opinion. It is the waiver, not the warranty of fitness, which must be expressed. Further, the expressed warranty referred to by the trial court is a warranty of title and peaceable possession, not of fitness.
The trial court also relied on a warranty given by Evangeline in its settlement with Cabildo that no other interest existed in the property. Reliance on that warranty is unfounded. An assertion that no rights or interests were transferred, contained in a document executed almost one year after the transfer of ownership of the property in question, is of no consequence to warranties given at the time of transfer.
We also find that as a matter of law Dixie was subrogated to Evangeline's rights and actions against Cabildo and Jemison. The implied warranty of materials and workmanship in a building contract is one to which a subsequent purchaser is subrogated. There is no need for privity of contract between the contractor and the subsequent purchaser of immovable property to sustain a right of action. Aizpurua v. Crane Pool Co. Inc., 449 So.2d 471 (La.1984); Smith v. Ly, 498 So.2d 128 (La. App. 5 Cir.1986).
The rights acquired by Dixie were passed on to the subsequent buyers of the condominium units. We also note that the original 22 purchasers acquired full rights directly from Evangeline. The rights of the present owners were subrogated to Dixie (Landmark) by virtue of the settlement between the parties executed on December 4, 1987. Thus we find that Dixie (Landmark) has a right of action against Cabildo and Jemison, and that the trial court erred when it maintained the exception of no right of action.
Res Judicata
The trial court held that the compromise and settlement between Evangeline and Cabildo was dispositive of all rights and issues alleged in Dixie's (Landmark's) current suit.
To maintain an exception of res judicata it must be shown that there exists identity in the two suits as to the thing demanded, the demand must be founded on the same cause of action, and the demand must be between the same parties. Watson v. Amite Milling Co., Inc., 504 So.2d 1149 (La.App. 5 Cir.1987). Our doctrine of res judicata is to be interpreted stricti juris, and any doubt as to compliance with its requirements is to be resolved in favor of the plaintiff. Rhodes v. O'Connor-Valls Laboratory Inc., 470 So.2d 334 (La.App. 5 Cir.1985); Watson v. Amite Milling Co. Inc., supra.
Compromise agreements between interested parties have a force equal to the authority of the thing adjudged. LSA-C.C. art. 3078. Thus they can be used as a bar to subsequent litigation. However, such agreements are only binding on those who were parties to the compromise. LSA-C.C. art. 3077.
In Audubon Ins. Co. v. Farr, 453 So.2d 232 (La.1984) a claimant settled an insurance claim with the tortfeasor's carrier after receiving payment from and subrogating her rights to her own carrier. When her carrier attempted to exercise its subrogated right to collect from the tortfeasor's insurer, the settlement was used as a bar to the suit. The court ruled that a compromise settlement made by a tortfeasor without notice or knowledge that the claim had been assigned acted as a bar to future litigation. The court reasoned that since *806 the insured had violated the terms of the subrogation agreement by settling with the tortfeasor, the plaintiff insurance company was aggrieved by its insured and thus had a recourse against its insured. The insured, rather than a stranger, was held responsible.
The facts in the instant case distinguish it from Audubon, supra. Cabildo took cognizance of the fact that Dixie had a superior interest in the property when it confected the construction contract. There were 22 individual owners and a condominium association at the time of the settlement who were known to Cabildo but not made a party to the settlement. Therefore, we believe Cabildo had sufficient notice that other interested parties existed at the time of settlement.
On the other hand, Dixie accepted ownership of the property in exchange for release of Evangeline's debt at the time of the dation without knowledge of the litigation between Cabildo and Evangeline. Further, Dixie had no knowledge of the subsequent settlement between the two. We do not believe that under these circumstances Cabildo should be allowed to bar interested parties not made a party to the compromise agreement from assertion of claims against them.
Since lack of identities of parties is sufficient to preclude an exception of res judicata, we find it unnecessary to discuss the issue of identity of the thing demanded. By this opinion we find only that the trial court's decision to maintain the exceptions and dismiss plaintiffs' suit is incorrect and must be reversed; we do not make any findings as to the merits of this cause. The matter is remanded for further proceedings.
REVERSED AND REMANDED.
NOTES
[1] The name was changed from Evangeline Trace on September 15, 1985.
[2] On May 1, 1988 Dixie underwent a corporate name change to Landmark Savings Bank, S.S.B.
[3] The differences between a dation and a sale are explained in LSA-C.C. arts. 2656 through 2658 as follows:

Art. 2656. Delivery essential to a giving in payment
That giving in payment differs from the ordinary contract of sale in this, that the latter is perfect by the mere consent of the parties, even before the delivery, while the giving in payment is made only by delivery.
Art. 2657. Risk of thing pending delivery
From this distinction result consequences which are different in relation to the risk of the thing sold; which risk, in this species of contract, never falls upon the creditor, before delivery, unless he has delayed beyond a reasonable time to obtain the thing.
Art. 2658. Giving in payment by insolvent debtors
This difference gives rise to another in the effect of these contracts, in cases of the insolvency of the debtor. He may, although insolvent, lawfully sell for the price which is paid to him; but the law forbids to give in payment to one creditor, to the prejudice of the others, any other thing than the sum of money due.